# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ANGELA DEBOSE,

     **Plaintiff,**

**v.**

                             CASE NO. 8:25cv828-WFJ-AAS

**FLORIDA POLYTECHNIC UNIVERSITY**
**BOARD OF TRUSTEES,**

                             **JURY TRIAL DEMANDED**

     **Defendant.**

_____/

## VERIFIED COMPLAINT

Plaintiff Angela DeBose ("Ms. DeBose"), individually, brings this action against the Defendant, Florida Polytechnic University Board of Trustees ("FPUBOT"), and alleges as follows:

APR 4 2025 AM9:20
FILED - USDC - FLMD - TPA

## I. PARTIES

1. The Plaintiff is a State of Florida resident in Hillsborough County, Florida. Plaintiff was formerly an employee of the state government university and agency, Florida Polytechnic University ("FPUBOT") and its Board of Trustees ("FPUBOT"). The Florida Civil Rights Act of 1992" ss. 760.01- 760.11 secures for all individuals within the state freedom from discrimination because of race, sex, age, and retaliation. The FCRA's anti-retaliation provisions make it unlawful for past, present, and prospective employers to punish employees for having engaged in



statutorily protected activity. Section 704(a) of Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment" who have availed themselves of Title VII's protections." See *Robinson v. Shell Oil Co.*, 519 U.S. 337, (1997). Insofar as § 704(a) expressly protects employees from retaliation for filing a "charge," and a charge under § 703(a) alleging unlawful discharge, former employees were included within the scope of "employees" protected by § 704(a) who could bring an action.) Ms. DeBose sues FPUBOT for employment discrimination, retaliation, and hostile work environment harassment.

2.      Defendant Florida Polytechnic Board of Trustees ("FPUBOT") is the governing body of the Florida Polytechnic University ("FPUBOT"), and public body corporate created by Article IX, Section 7 of the Constitution of the State of Florida. Defendant FPUBOT is based at 4700 Research Way, Lakeland, Florida. Defendant FPUBOT is a body corporate authorized to sue and be sued under the laws of the State of Florida on behalf of FPUBOT. FPUBOT is an "employer" in an "industry affecting commerce" as defined by federal and Florida law. FPUBOT is part of the State University System with its main campus in Polk County, Florida. At all times material hereto, Plaintiff was an employee of Defendant FPUBOT, a public university within the State University System of the State of Florida and a "state agency" pursuant to §216.011(1)(qq), Florida Statutes. FPUBOT was established on

April 20, 2012 and has developed a history of discrimination and retaliation. Plaintiff was an employee of Defendant FPUBOT and is an aggrieved person within the meaning of Title VII. Defendant FPUBOT is an employer within the meaning of Title VII.

## II. JURISDICTION

3.     Plaintiff is a resident of Hillsborough County, Florida and was employed in Polk County, Florida.

4.     Defendant FPUBOT is located in Polk County, Florida.

5.     This complaint is brought for discrimination in employment pursuant to Title VII. The general purposes of the Title VII is to secure for all individuals within the state freedom from discrimination because of race, sex, age, and retaliation.

6.     This complaint is brought for retaliation in employment under the TITLE VII's anti-retaliation provisions making it unlawful for past, present, and prospective employers to punish employees for having engaged in statutorily protected activity.

7.     This complaint is brought for retaliation under Chapter 112 of the Florida Statutes, the Florida Whistleblower Act. The statute is designed to prevent agencies or independent contractors from retaliating against employees who report illegal activity.

8.     A Notice of Right to Sue letter ("RTSL") from the Equal Employment Opportunity Commission ("EEOC") has been obtained against FPUBOT.

9.     This Court has subject matter jurisdiction over this matter under § 47.011 and § 47.051 Florida Statutes, because Polk County is where a significant part of the action accrued.

10.    Venue in Hillsborough County is proper as the Plaintiff resides in Hillsborough County, Florida and  because a substantial part of the events giving rise to Plaintiff's claims occurred in both Hillsborough and Polk county judicial districts and had a substantial effect on Ms. DeBose in these judicial districts.

## INTRODUCTION

11.    This is a sad and most shocking case of discrimination, retaliation, conspiracy, and interference. Angela DeBose, while working for Florida Polytechnic University, experienced racial, gender, and age discrimination in employment and retaliation for the exercise of her civil and constitutional rights in a manner that most Americans would have believed unthinkable in the third millennium or the third decade (i.e., the 20s) of the 21st Century.

12.    FPUBOT contracted with Greenberg Traurig, P.A. (alternatively Greenberg Traurig, LLP) and its employees RICHARD C. MCCREA, CAYLA PAGE, and GIG CARCAMO (hereinafter collectively "GTLAW") as part of a conspiratorial agreement with the UNIVERSITY OF SOUTH FLORIDA BOARD OF

4

TRUSTEES ("USFBOT"), to discriminate, retaliate, and deploy other methods to oust or force Ms. DeBose from her job.

13.     Ms. DeBose, a black female Department Head at FPUBOT, was mocked, threatened, demeaned, demoted, punished, falsely accused of misconduct, ostracized, and humiliated under this unlawful agreement by FPUBOT and GTLAW, on behalf of USFBOT and on account of Ms. DeBose's race-gender (protected racial and gender classification as a "black female"), age, and protected activity comprised of internal and external complaints with appropriate state and federal governmental agencies.

14.     The agreement by FPUBOT with GTLAW was paid for using State funds. When Ms. DeBose discovered the contract, she was denied access to nonexempt public records.

15.     When Ms. DeBose filed a Whistleblower Complaint, reporting the use of state funds to carry out a discriminatory, retaliatory intent/purpose, FPUBOT further retaliated against her because of her race-gender, age, and protected activity. FPUBOT terminated Ms. DeBose's complaint without conducting an investigation, alleging that because she subsequently retired, Ms. DeBose was no longer a SUS employee.

16.     At all relevant times the contract by FPUBOT and GTLAW was in effect or operation, Ms. DeBose was an SUS employee.

17.     Ultimately, Ms. DeBose requested part-time leave under FMLA due to the stress and adverse, retaliatory actions she experienced from filing internal complaints at FPUBOT Employee Relations/Human Resources unit, the Florida Commission for Human Relations ("FCHR"), and the United States Equal Employment Opportunity Commission ("EEOC").

18.     Ms. DeBose resumed full-time work remotely in order to continue her employment or remain employed away from the hostile, retaliatory work environment that existed.

19.     The terms of her employment had been detrimentally altered.  As a Senior Director or Department Head, Ms. DeBose led a department of four staff.  The University President, Randy Avent ("Avent"), University Provost, Terry Parker ("Parker"), Controller Penelope Farley ("Farley"), and CIO/VPIT Mike Dieckmann ("Dieckmann") ostracized and harassed  Ms. DeBose and attempted to discredit her to her entire department.

20.     As vacancies occurred in the polarized environment, AVENT, PARKER, FARLEY, and DIECKMANN conspired together against Ms. DeBose, defunding her department, not allowing her to fill vacant positions, and requiring her to work alone in providing primary support for FPUBOT's Workday ® Enterprise Resource Planning ("ERP") or business management system.

21.    Legal intervention is vitally necessary to make clear that the blatant disregard of federal and state law; civil, constitutional, and statutory rights; etc. will not be tolerated.

22.    The degradation, marginalization, humiliation, discrimination, and retaliation of blacks/African Americans based on race in the terms and conditions of employment should have ceased long ago and should not be tolerated in any workplace in America.

23.    The use of racial slurs, mockery, and epithets—and its variants of other hate speech in the workplace should not be excused or protected by employers, police or government agencies, or the courts.

24.    Ms. DeBose experienced overwhelming unlawful conduct of this character because of the unlawful agreement formed among FPUBOT, GTLAW and USFBOT, often on a daily basis.

25.    Ms. DeBose was subjected to other forms of hostile work environment harassment and discrimination on account of her race-gender, age, and protected activity.

26.    A dead lizard was strategically placed on the keyboard on her desk when she returned to work onsite at Florida Polytechnic University.

27.    Penelope Farley and Mike Dieckmann engaged in coworker harassment against Ms. DeBose, attempting to sabotage her work.

28.    President AVENT and Provost PARKER knew of the unlawful racially

discriminatory, retaliatory acts but did nothing to Ms. DeBose's knowledge to stop

FARLEY and DIECKMANN.

29.    Offenders FARLEY and DIECKMANN were not disciplined because their

conduct was in alignment and agreement with the contract among FPUBOT and

GTLAW on behalf of USFBOT.

30.    Because Ms. DeBose complained and on account of her race-gender and age,

FPUBOT denied Ms. DeBose's written application to extend her DROP / retirement

an additional three (3) years, as accorded to State employees by the Florida

Legislature.

31.    FPUBOT's adverse action deprived Ms. DeBose of a legislated right to extend

that would have increased her interest rate on her retirement accumulations from 1.3

to 4 percent.

32.    FPUBOT denied Ms. DeBose's application for what should have been an

*automatic* extension for which there were no criteria nor qualifications that Ms.

DeBose did not satisfy; FPUBOT took an adverse action against Ms. DeBose

because of her protected activity and on account of her protected classification(s) by

its de facto ("in fact" or "in reality") termination.

33.    FPUBOT extended the retirement date of a similarly situated white male

employee in DROP.

34.    Prior to the termination of her employment, Ms. DeBose was technically demoted, without cause.

35.    Ms. DeBose's duties were restricted. As part of a forced reorganization, Ms. DeBose's reporting line changed to Provost PARKER and subsequently her peer, CIO DIECKMANN.

36.    When Ms. DeBose complained about having to report to a co-worker who harassed her and was also a peer, DIECKMANN was promoted without a search to VP of Information Technologies, taking over Ms. DeBose's department, budget, and vacant positions.

37.    DIECKMANN used his promotion to further marginalize Ms. DeBose. He sought to interfere with her request for FMLA and prevent her use of leave. DIECKMANN removed Ms. DeBose from Workday meetings where her attendance was usual or expected on account of her race-gender, age, and protected activities. Ms. DeBose was *blackballed* from supporting the Workday platform for Finance & Accounting—an integral part of her job—by harassing coworkers, DIECKMANN and FARLEY.

38.    Ms. DeBose had high performance ratings and received glowing reviews and laudatory letters of recommendation from her previous supervisors, including the CFO and VP of Finance and Administration.

39.    In the forced reorganization under Provost PARKER, Ms. DeBose was suddenly average or meets expectations and needing improvement in the area of collaboration.  The Plaintiff recognized these stated reasons as obvious pretexts for racial hostility and retaliation from USFBOT's playbook. It seemed surreal or like *Déjà vu* until Ms. DeBose discovered the contract between FPUBOT and GTLAW, on behalf of USFBOT.

40.    The retaliation against Ms. DeBose also caught up potential witnesses or plaintiffs.

41.    The terms and conditions of Regina Siewert's employment changed because of her association with Ms. DeBose.

42.    Regina Siewert, a Hispanic female, was not retained and her DROP retirement date was also not extended, although a white male's date was extended.

43.    Because of her support for Ms. DeBose, Regina Siewert and others experienced repeated acts of retaliation from AVENT, PARKER, DIECKMANN, and FARLEY, including have pay restricted through policies that appeared facially neutral and broadly applicable but, upon scrutiny, were clearly targeted at Ms. DeBose and her supporters.

44.    Plaintiff sues FPUBOT because it is partly responsible for this unchecked pattern and practice of virulent racial discrimination and retaliation against her.

45.     FPUBOT's Officers condoned or failed to stop this behavior by FPBOT, GTLAW, and USFBOT.   The Board has orchestrated and participated in this retaliation against Ms. DeBose because she sought a legal remedy through the courts to eradicate the racially hostile work environment, discrimination, and retaliation to which she was subjected.

46.     The claims under TITLE VII are administratively exhausted and ripe for suit.

47.     Plaintiff has suffered psychological harm directly attributable to her mistreatment.

48.     Plaintiff seeks damages as well as such other relief as this Court deems just and proper.

49.     Plaintiff demands a trial by jury.

## GENERAL ALLEGATIONS

50.     Angela DeBose worked at FPUBOT from July 2015 to August 31, 2023.  Ms. DeBose started as a consultant/independent contractor on a project concerning FPUBOT's legacy student system, Three Rivers CAMS.

51.     From October 2015 to February 2016, Ms. DeBose was an OPS salaried employee at $100,000.00 annually, employee without paid-time-off benefits.

52.     In February 2016, Ms. DeBose accepted a permanent position as Associate Director, Business Systems management, through June 2017 when she was hired as a Senior Director or Department Head responsible for FPUBOT's Workday ERP.

Ms. DeBose named her department Enterprise Systems. She achieved high performance ratings and was on track to become an AVP.

53. Through MCCREA, PAGE, and CARCAMO, USFBOT and GTLAW made inquiries to FPUBOT about Ms. DeBose. In 2016, FPUBOT was asked the reason Ms. DeBose provided on her job application for leaving USF—implying or inferring that Ms. DeBose may have lied or falsified her application. This question was retaliatory and not related to any court proceedings. It was raised in close proximity to the time that FPUBOT offered Ms. DeBose a position and she accepted. The adverse, retaliatory inquiry was thwarted or rebuffed because Ms. DeBose answered truthfully in her application and in her interviews.

54. In December 2018, USFBOT and GTLAW solicited information from FPUBOT about Ms. DeBose's pay. On behalf of USF and GTLAW, MCCREA presented false information to a federal magistrate about Ms. DeBose's pay at FPUBOT, in retaliation against Ms. DeBose as the verdict winner in her Title VII discrimination and retaliation case, asking that Ms. DeBose not be awarded front pay.

55. Ms. DeBose suspected USFBOT and GTLAW had other communications when her employment at FPUBOT began to dramatically change. By way of example:

a.     Sometime around May 2020, the CIO became vacant at FPUBOT following the resignation of the incumbent.  Mark Mroczkowski requested to promote Ms. DeBose to an AVP position, increase her pay, and considered adding Information Technologies to Ms. DeBose's portfolio, having her lead it and Enterprise Systems.

b.     Randy Avent and Terry Parker informed Mark Mroczkowski, who ran the IT department following resignation of the CIO, that they wanted a man for the position and to tell Ms. DeBose not to apply. This message was reinforced when Ms. DeBose received an email appointing her to the CIO Search Committee.

c.     On August 5, 2020, Mark Mroczkowski sent Angela DeBose an email with a Subject line, "Are you in DROP?"  Ms. DeBose's DROP status, though qualified as sensitive or confidential information, was discussed as part of an adverse, retaliatory communication at a President's cabinet meeting when the request was made for Ms. DeBose to receive a promotion to an AVP title and a pay increase.  The adverse, retaliatory communication deprived Ms. DeBose of pay and promotion because of her protected classifications and legislated or protected right to enroll in DROP.

d.     Undeterred, Mark Mroczkowski made the request again, multiple times.  He requested that the Chief of Police, a white male, also be promoted

along with Ms. DeBose—stating this approach to also promote a white male might "inspire Randy".

e.    On August 21, 2020, AVENT stated that an AVP title was inconsistent with Ms. DeBose's status. AVENT stated that Ms. DeBose should first be a leader of a department or department head like the others. When AVENT was informed by Mark Mroczkowski that Ms. DeBose was already a department head and performed exemplary in the role, AVENT rejected the title change and pay increase because of Ms. DeBose's age and future plans to retire.[1]

f.    In November 2020, AVENT and PARKER decided to stop the Workday Student implementation project which Ms. DeBose led and commission the Tambellini Group ("Tambellini") to review the Workday Platform at FPUBOT, and potentially recommend a business and student system replacement.

g.    In December 2020, Alicia Maule resigned from FPUBOT expressing that, *"Three years is too long to wait that long for Angela to retire."*

---

[1] At USF, DROP was raised as an issue because Ms. DeBose completed 30 years of service at age 55. This allowed her to defer DROP and elect to begin participation at any time between completing 30 years and reaching age 57. Ms. DeBose lost this benefit because of her per se retaliatory termination from USF. Ms. DeBose was in the Investment Plan at FPUBOT. However, FPUBOT stated to Ms. DeBose that she was in the FRS Pension Plan to prevent her from being paid out her retirement in a lump sum.

h.    On December 22, 2020, Penney Farley requested Ms. DeBose hire Alicia Maule back on a contractual basis so that she could *"maintain a lifeline to her"*.

i.    Penney Farley complained and made false accusations to Randy Avent and Terry Parker that *"Angela did not do enough to keep Alicia Maule and may have been the reason Alicia left."*[2]

j.    AVENT subsequently sent Ms. DeBose emails in which he complained about the use of consultants, alleging that someone of Alicia Maule's caliber would be able to manage Workday without consultants.

k.    AVENT suggested or inferred in the emails that Ms. DeBose was suddenly not qualified and that Alicia Maule, a young, white female under 40, was suddenly better qualified.  AVENT did not have any direct knowledge of Alicia's knowledge, skills, abilities.

l.    Upon learning of the ways that FARLEY undermined and harassed Ms. DeBose, AVENT stated to Ms. DeBose when they met in person, *"What Penney wants, Penney gets."*

m.    FARLEY continued to meet with Alicia Maule on a regular basis in 2021 after her employment ended with FPUBOT, while Alicia Maule was

---

[2] USF made a similar allegation involving a white female employee, Caurie Waddell.

employed by CrossVue. There was no contract with CrossVue at the time to book or account for Alicia Maule's hours.

n.      In January 2021, Alicia Maule asked Ms. DeBose to consider CrossVue for FPUBOT's Workday projects.

o.      Ms. DeBose met with Alicia Maule, FARLEY, and CrossVue representative, Andali Booysen, on February 8, 2021. CrossVue asked for a sole source, exclusive contract as FPUBOT's engagement partner for Workday, replacing not only other vendors but the Enterprise Systems department.

p.      Ms. DeBose declined to use CrossVue because it had no prior higher education experience and charged a higher rate than FPUBOT's existing Workday engagement partners.

q.      AVENT, PARKER, DEICKMANN, and FARLEY instigated an effort to outsource 50% or more of Ms. DeBose's work in order to meet Alicia Maule's demand to work 100% remote for FPUBOT, but through CrossVue, by assigning them a contract.

r.      There was no discussion with Ms. DeBose and every effort was made to marginalize her after reversing/overriding her decision. The award of the contract did not follow the normal Procurement process.

s.    In a *quid pro quo* arrangement, FARLEY established a Workday support contract with CrossVue on the condition that as a new consultant, Alicia Maule would lead or be involved in every project and that FARLEY would be the contract/project manager, not Ms. DeBose, undermining Ms. DeBose's leadership role as the head of Enterprise Systems and her primary responsibility for Workday.

t.    Because CrossVue charged a higher rate, FARLEY and DIECKMANN manipulated the procurement process, asking another vendor EdgeRock to change its terms to an amount slightly higher than CrossVue.

u.    Laura Marrone in Procurement manipulated the process so that CrossVue could be awarded the contract.  When the process was questioned by Ms. DeBose, Laura Marrone became belligerent and stated the contract was "*perfectly procured.*"

v.    To prevent displaced EdgeRock from lodging a complaint, DIECKMANN promised to utilize EdgeRock on another contract.  A short time after the deal with CrossVue was set, FPUBOT terminated the contract/relationship with EdgeRock.

w.    The Provost informed Ms. DeBose that FPUBOT would not be implementing Workday Student, the system recommended by the Tambellini Group and consulting group, Plante Moran. Sometime after this decision,

17

AVENT and PARKER had Tambellini reword its final report to be less conclusive so that it would result in fewer questions from FPUBOT'S Board and the Florida Board of Governors.

x.      In March 2021, Gina Delulio formed a team of white female department heads who voted to have Ms. DeBose, the only black female department head, and her team move out of their offices to substantially smaller drab offices with less privacy, more noise, and a greater walking distance because allegedly Procurement wanted the space. Ms. DeBose was not invited to the prior meetings but was instead asked to attend the meeting where the change in Enterprise Systems' office locations was announced.

y.      The department head of Procurement, Treasa Mclean, stated that she did not request nor want the spaces but stated she had been demoted, her pay was decreased, and she was being forced to resign or retire. Ms. Mclean warned Ms. DeBose that DIECKMANN asked to see *"all contracts managed by Angela."* Ms. Mclean said she was *"told"* (emphasis added) to comply with DIECKMANN's request.

z.      In April 2021, the PARKER ordered or commanded that Ms. DeBose send out a survey to a select group of employees that he identified to ask them

about their *"pain points"*[3] with Workday and/or Workday Support. Unknown by Ms. DeBose at the time, the group identified by PARKER had already secretly convened. FARLEY wrote a highly critical report and alleged it was not just from her or her department but for *"everyone."* FARLEY stated that DeBose and/or Enterprise Systems staff could not provide the support needed with Workday Financials following the resignation of Alicia Maule.

aa.    Alicia Maule, a white female subordinate reporting to Ms. DeBose, had only some end-user experience with Workday through her former employer, St. Leo University,  and had a CPA license.  Alicia Maule made a poor showing on an Assessment used by HR in the hiring process. At the urging of others,  Ms. DeBose hired Alicia Maule and extensively trained her.

bb.    In June 2021, at AVENT's, PARKER's, AND DIECKMANN's directive, FPUBOT terminated other contracts that Ms. DeBose managed (e.g., Workday Student, Workday Training, Huron). PARKER demanded that the Workday implementation tenants be deleted and not archived by Workday—as insurance that FPUBOT would not reconsider Workday Student or Ms. DeBose's position of leadership over the project.

---

[3] Though "pain points" is terminology used in business, it was used by USF as pretext for the Ellucian visit and report.

cc.    In July 2021, AVENT took away the training budget in Enterprise Systems. The budget was dramatically reduced and the department was defunded by 50%. Subsequently, the budget and cost center was overtaken altogether by PARKER and DIECKMANN.

dd.    In October 2021, PARKER directed that certain actions be taken to further reduce Enterprise Systems staff, demanding that Ms. DeBose terminate the employment of James Xin, an Asian male, without cause. PARKER asserted that James Xin did not have any sort of employment arrangement with FPUBOT and was suddenly a security risk. Ms. DeBose produced documentation to show that James Xin's present position was approved/funded by her supervisor and former CFO, Mark Mroczkowski. Nevertheless, PARKER demanded James Xin's termination. Alicia Maule detested James Xin because he was highly intelligent, capable, and *Asian*. FARLEY and DIECKMANN urged others to support their contention that his contingent worker status posed a security risk. Ms. DeBose pointed out that the reason for the decision was mere pretext, given that the interim AVP/HR, Marsha Leap, a white female, and several other white workers were also on a contingent worker contract. PARKER demanded James Xin's immediate termination and stated the vacancy would not be filled.

ee.     On October 11, 2021, Ms. DeBose filed a grievance with Regina Brown, Human Relations, which was reorganized temporarily under the General Counsel. The General Counsel rejected the grievance the very next day on October 12, 2021, alleging it was insufficient.

ff.     On February 10, 2022, FARLEY attempted to hijack Ms. DeBose's project to configure a new payroll bank account. The setup was in development and then test and was moved to production for first time use in January 2022. After the first successful run, CrossVue's Alicia Maule changed the bank account information in production, without notice to anyone. Neither Alicia Maule nor any other CrossVue consultant was involved in the testing and deployment of the new bank account configuration. FARLEY exclaimed "*what a mess*" when problems surfaced as a result of the change but at no time informed Ms. DeBose that she solicited Alicia Maule to make that change, which impacted the payroll checks and settlement runs. Jobs were canceled and Ms. DeBose had to reconfigure the system back to its prior state. It was not until Ms. DeBose produced the audit trail that FARLEY admitted that she had Alicia Maule make the change.

gg.     PARKER declined Ms. DeBose's request to require greater transparency from CrossVue and to have them follow the change control and management process Ms. DeBose established through the Workday

Operations Team (a.k.a. WOT). PARKER declined Ms. DeBose's request to decommission Alicia Maule's access.

hh.     On February 15, 2022, Ms. DeBose updated her grievance with Regina Brown, Human Relations, who initially insisted the grievance had been closed but accepted the documentation.

ii.     PARKER asked Ms. DeBose to develop a proposed governance structure for the Student Information System. When Ms. DeBose did so, PARKER and DIECKMANN used DeBose's information to set up similar governance structures to eliminate/replace the Workday Steering Committee, oversight/advisory board, and Workday Operations Team (WOT), change advisory board, Ms. DeBose established at implementation. DIECKMANN established USEC and UCOORD with redundant membership to the Workday Steering Committee and WOT, and subsequently attempted to fold WOT into UCOORD. DIECKMANN also pronounced himself as the leader of the Workday Change Management Process and had Ms. DeBose function in a role in all respects subordinate to him.

jj.     On February 28, 2022, PARKER asked Ms. DeBose and the Registrar, Andrew Konapelsky, to review his construct for management of FPUBOT's major IT systems to justify the elimination of WOT and Ms. DeBose's leadership role as its chairperson.

kk.    On March 1, 2022, Ms. DeBose stated in writing to the Provost that the governance structure for HCM/Finance should await the onboarding of the VPFA/CFO since the primary process owners and managers of the business systems report to that position and because VPFA/CFO will likely be an integral participant/member of USEC. Ms. DeBose also informed the Provost that his proposed construct was decidedly biased in having one permanent chair for the SIS (i.e., the Registrar) while proposing a revolving chair for Workday, with FARLEY identified as Ms. DeBose's immediate replacement. This came on the heels of Ms. DeBose's updated grievance and data request.

ll.    PARKER also retaliated and reorganized Ms. DeBose under him and then demoted her under Mike Dieckmann—not the VPAF/CFO. Ms. DeBose had been told multiple times by AVENT that she would report to the newly hired VPAF/CFO .

mm.    On July 27, 2022, Lisette Brigham resigned her position as a Business Analyst in Enterprise Systems—a position in which she was paid approximately $80,000.00 annually. PARKER, who declined Ms. DeBose's prior requests for a pay increase for Lisette Brigham, suddenly approved a plan by DIECKMANN to match and/or exceed Lisette Brigham's offer— which exceeded Ms. DeBose's annual salary. Ms. DeBose trained Lisette Brigham and subsequently approved her for specialized training to gain

Workday Pro Certifications in HCM and Recruiting. Lisette Brigham rebuffed their offers to remain with FPUBOT. PARKER and DIECKMANN prevented Ms. DeBose from filling any of her vacant positions; they required Ms. DeBose to manage and work the Workday ERP platform alone.

56. Sometime around July or August 2022, Ms. DeBose discovered that USFBOT and GTLAW exchanged many communications about or concerning her with FPUBOT, allegedly to pressure FPUBOT to terminate her employment, in retaliation for the litigation and/or protected activities Ms. DeBose engaged in against them; USFBOT and GTLAW set out to deprive Ms. DeBose of her income and livelihood with FPUBOT.

57. Sometime prior to July 22, 2022, PARKER, DIECKMANN, FARLEY and Alicia Maule attempted to set Ms. DeBose up for a written reprimand or terminable offense at a CrossVue meeting. Eamon Wong, CrossVue consultant, attended the meeting with Alicia Maule as a "plant" to validate her "contrived or planned" accusation that Ms. DeBose behaved in an uncollaborative manner.

58. On July 22, 2022, Regina Brown, Employee Relations, asked Ms. DeBose to meet to answer questions about the meeting. PARKER, several weeks later evaluating Ms. DeBose's performance, intentionally or willfully waited/delayed for the meeting with Regina Brown.

59.     PARKER gave her a low rating in the area of collaboration and a low or marginal increase.  The meeting occurred weeks after the evaluation period and deadline for performance reviews.  The Provost delayed evaluating Ms. DeBose's performance until after this meeting to justify using this alleged event.  The meeting was outside of the Current Year evaluation period and technically in the Next Year. The meeting was a setup; Ms. DeBose did not behave in the manner alleged.   Ms. DeBose requested of PARKER and DIECKMANN, through Regina Brown, to have future meetings recorded.

60.     On August 5, 2022, Ms. DeBose requested leave under FMLA with accommodation to work less than a 40-hour week and work remotely to avoid the stress from the hostile work environment at work.  Co-workers avoided Ms. DeBose, learning that she was on AVENT's and PARKER's hit list.  A very dead dried-up lizard was strategically placed in Ms. DeBose's office on the keyboard on her desk, though her office was regularly or routinely cleaned.

61.     FARLEY and DIECKMANN used CrossVue's implementer access to make changes in Workday without notice or adherence to FPUBOT's change migration process developed by Ms. DeBose. This caused consequences and  disruptions that Ms. DeBose had to clear up.  Security monitoring, without specialized software, became impossible.

62.    DIECKMANN sought to block Ms. DeBose's FMLA; however, HR informed

him that he could not do so.

63.    On August 23, 2022, Ms. DeBose filed a complaint against USFBOT for post-

employment retaliation against her in her subsequent employment at FPUBOT with

the EEOC.    Under Florida's discovery and due diligence rule, Ms. DeBose's

discovery about the emails was unreasonably delayed.

64.    On August 24, 2022, Ms. DeBose made a public records request for emails

from her employer FPUBOT that covered the period from "2015 to the present" after

discovering that many communications were made about her to FPUBOT and

GTLAW. Ms. DeBose also requested the emails from USFBOT and/or its GTLAW

contractors.

65.    On September 8, 2022, the EEOC issued a RTSL.

66.    Ms. DeBose filed internal grievances and/or charges of discrimination,

retaliation, and hostile work environment harassment with FPUBOT Employee

Relations/Human Resources and Victims Advocacy because FPUBOT did not have

a Diversity Inclusion Equal Opportunity office or mini-eeoc function like other SUS

higher education institutions in Florida.

67.    On September 12, 2022, Sherri Pavlik, an employee in FPUBOT's General

Counsel's Office, reported the results of a total of 2,725 records. Pavlik emailed an

invoice for $45,946.01. Thereafter, David Fugett, FPUBOT's General Counsel

requested that Ms. DeBose meet with him and another attorney, Alex Landback, on October 24, 2022, during work hours, about her public records request for documents. Ms. DeBose accepted the meeting but asked to have it recorded. Fugett stated the meeting would not be recorded but agreed to a virtual meeting.

68.     On October 24, 2022, the lawyers came unexpectedly to Ms. DeBose's office. Subsequently, they attempted to set up a videoconference call. Mr. Fugett stated the emails would not be provided and urged Ms. DeBose to back away from pursuing the documents.

69.     On October 26, 2022, a subpoena duces tecum was served on David Fugett, FPUBOT's General Counsel, for the production of the 2,725 records returned from Ms. DeBose's search criteria. Ms. Pavlik's email was attached to the subpoena to clearly describe the records and to show that the requested records exist. However, no response came from Fugett until November 11, 2022. Fugett emailed Ms. DeBose at her personal email account and stated the subpoena was served on him but he would not be responding.

70.     Sometime in November 2022, Ms. DeBose filed a Police Report with the Lakeland Police Department and State Attorney's Office for the Tenth Judicial Circuit. The LPD and SAO assigned Case No. 2022-00085303 to conduct an investigation, which allegedly corresponds or links to the case number assigned by FPUBOT's police department. In responding to the university police, Fugett on

behalf of FPUBOT's General Counsel's Office stated the subpoena was no longer in force because the federal district court dismissed Ms. DeBose's case.

71.    On December 7, 2022, Ms. DeBose filed suit against USFBOT in order to meet the RTSL deadline and to seek the emails exchanged among FPUBOT, GTLAW, and USFBOT, et al., through discovery.

72.    USFBOT refused to provide the emails in response to Ms. DeBose's first and second production requests. USFBOT and FPUBOT refused to provide responses to Ms. DeBose's public record requests.

73.    On March 7, 2023, MCCREA and/or GTLAW asserted the emails were privileged and alleged for the first time that MCCREA and/or GTLAW represented FPUBOT and had a contract with FPUBOT to represent it in employment matters about or concerning Ms. DeBose. FPUBOT did not object but also did not comply. Based on information and belief, FPUBOT was allegedly being pressured by USFBOT and GTLAW to terminate Ms. DeBose. However, MCCREA disclosed that FPUBOT willingly participated according to the contract and acted on its own initiative.

74.    On April 11, 2022, Ms. DeBose made a public records request for the contracts that MCCREA and/or GTLAW claims were made with FPUBOT and existed, from FPUBOT's General Counsel. Initially, the person responding to ogc@floridapoly.edu sought to unlawfully impose a charge for the contracts. When

Ms. DeBose objected, the original contract and an Amendment were provided. However, none of the underlying documents to show the scope of the contracts or work orders were provided. FPUBOT's General Counsel's office stated no additional documents would be provided.

75. In the months of July and August 2023, FPUBOT hired/promoted 4-6 new workers to support Workday after Ms. DeBose's retirement, all the while having her work alone or with a significantly reduced staff. None of the new employees handled Workday tickets/projects to Ms. DeBose's knowledge. It appeared that they were set to start when Ms. DeBose was ousted or no longer employed.

76. On September 8, 2023, FPUBOT was subpoenaed again to produce the emails and also the underlying documents that comprised the contracts and agreements by and between FPUBOT, GTLAW, MCCREA, (and USFBOT). FPUBOT's production of responsive records was due by 10:00 a.m. on September 18, 2023. FPUBOT had the option to email or appear at the location designated on the subpoena to provide the documents.

77. On September 18, 2023, Ms. DeBose contacted Mr. Fugett by email when FPUBOT failed to take either action. Mr. Fugett responded at 10:27 a.m. on 9/18/2023 that FPUBOT would provide the information via email that day. However, the files were subsequently copied to a flash drive and delivered via Fedex on September 22, 2023.

78.    On September 29, 2023, Ms. DeBose informed Mr. Fugett the production of the emails was deficient.  Ms. DeBose requested the emails to the "present" time, which was determined by the Court  in the USFBOT lawsuit as the last subpoena date of September 8, 2023.

79.    Because the files did not match the search criteria, Ms. DeBose requested copies of the scripts used to extract the records for the files.  However,  FPUBOT failed to produce the additional emails through September 8, 2023 or the scripts.

80.    The emails produced by FPUBOT stopped in 2022.  Ms. DeBose suspects spoliation.

## SUMMARY OF ADVERSE ACTIONS

### Promotion/Pay

81.    Ms. DeBose, Enterprise Systems Director, a black female; Controller,  a white female; HR Director, a white female; Procurement Director, a white male replaced by white female; Facilities Director, a white male; IT Director, a white male; and Police Chief, a white male, were direct reports to the Chief Financial Officer ("CFO").  Ms. DeBose became the only black department head and was treated differently than her similarly situated comparators of department heads.  Similarly situated refers to one class of persons being alike in all relevant ways to another class for purposes of a particular decision or issue.

82.    To establish a prima facie case of disparate treatment under Title VII, a plaintiff must show "(1) she is a member of a protected class; (2) she was qualified for her position/title; (3) she experienced an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably." Ms. DeBose, a black female, is a member of a protected class; is strongly qualified for her position/title with vast work experience and education; Ms. DeBose experienced an adverse employment action when FPUBOT took an adverse or retaliatory employment action by denying her a change in title to AVP of Enterprise Systems and an equitable salary increase on more than one occasion; and similarly situated individuals  (Controller, Human Resources, Procurement, and Facilities) outside her protected class were treated more favorably in having a title change to AVP and pay increases.

83.    When Ms. DeBose complained to AVENT and pointed out that she was better qualified than her comparators, the University leadership set out to eliminate Ms. DeBose's comparators with lesser qualifications, and Ms. DeBose.

84.    Historically, FPUBOT (General Counsel, Gina Delulio) went after a black male Controller, who subsequently resigned, accepting another position. FARLEY, a white female was hired to the position of AVP/ Controller.

85.    FPUBOT demoted the AVP/Procurement & Auxiliaries director in title and compensation, forcing her to retire/resign or face termination.

86.     FPUBOT created a new AVP/CIO position, having the interim IT Director report to the CIO position and the AVP/CIO instead report to the CFO.

87.     Ms. DeBose's white counterparts were paid $150K and above while she was paid $124K. Ms. DeBose was equally or better qualified than her white female and male counterparts.

88.     When Ms. DeBose pointed out the disparate treatment that existed in title, promotion, pay, and compensation, and benefits, President AVENT and Provost PARKER "solved the problem" by promoting Ms. DeBose's white male counterpart, DIECKMANN, from CIO/AVP to CIO/VPIT. Prior to the VPIT promotion, Ms. DeBose reported the hostile work environment harassment by DIECKMANN to Employee Relations and filed a grievance. The grievance was immediately declined and failed to be investigated.

89.     Ms. DeBose was slated to report to report to the new CFO and VP of Administration and Finance ("VPAF").

90.     After the reorganization and the change moving Ms. DeBose/Enterprise Systems under the CIO/VPIT DIECKMANN, it was Provost PARKER that evaluated Ms. DeBose's performance and controlled the Enterprise System's budget. PARKER dropped Ms. DeBose's rating from Excellent/Superior by the former CFO to a Meets Expectation rating. The Provost also gave Ms. DeBose a

low or marginal increase because of the lower rating he gave Ms. DeBose in her performance evaluation, as a means to justify the low increase.

91. PARKER asked DIECKMANN to remove Ms. DeBose from a University technology coordinating committee that PARKER used Ms. DeBose to establish. PARKER stated that he "did not feel free to speak" with Ms. DeBose in attendance, disregarding Florida's Sunshine Laws.

92. PARKER defunded Ms. DeBose's department, Enterprise Systems, by more than 50% and would not allow Ms. DeBose to fill vacant positions, though funding was not a concern.

93. Ms. DeBose was forced to work alone, expected to do the work of four, but with no additional remuneration.

94. PARKER and DIECKMANN attempted to block Ms. DeBose's use of her PTO before the end of the year, under unfavorable working conditions—(185 hours of use-it-or-lose-it paid time off that would not rollover). Subsequently, DIECKMANN attempted to block Ms. DeBose's use of FMLA until informed by HR that he could not cross that line.

95. DIECKMANN, FARLEY, AND PARKER utilized consultants with Cross Country/CrossVue to make changes in the Workday system to undermine, interfere, and/or sabotage Ms. DeBose's work.

96.     The VPIT lowered the job requirements for a Project Manager position to not require any degree.  After hiring white female, Laura Marrone, planned to be let go from Procurement to the Project Manager role, DIECKMANN added the requirements back, stating the pool was *"poor"*.  DIECKMANN had no consequence from rigging the search and hire of unqualified white female, Laura Marrone, to replace Ms. DeBose.

97.     After 2 or 3 months in the Project manager role, DIECKMANN promoted Laura Marrone from Project Manager to Director of a new well-funded and well-staffed department named "Enterprise Solutions".  DIECKMANN demanded that Laura Marrone be made a Workday Named Support Contact ("NSC") like Ms. DeBose, though she had no training.    DIECKMANN increased the Project Manager-turned-Director's salary significantly.[4]

98.     DIECKMANN informed Ms. DeBose that she could not be compensated for working alone without a team unless her request was made in writing. When Ms. DeBose made the request in writing, it was denied without explanation.

99.     Ms. DeBose's enrollment in DROP and her age was disclosed and used as a weapon against her to prevent her from being promoted and receiving salary equity and/or market rate adjustments.  Ms. DeBose's status was used to imply that she was

---

[4] Though Mike Dieckmann initiated a promotion and raise for Laura Marrone, it was not allowed to move forward but only after Plaintiff's amended complaint was filed.

not competent and being "fired from her job". To stop the false narratives by FPUBOT'S leadership, Ms. DeBose openly disclosed her plan to retire to WOT.

100. FPUBOT wasted $2 million dollars to move away from Workday Student to Ellucian's Banner Student system, thinking it would be an afront to Ms. DeBose because she filed a lawsuit against USFBOT and Ellucian. PARKER lied to that his decision to stop the Workday Student implementation saved FPUBOT $12 million when the fact is that Phase I of the Workday Student implementation was 95% completed when the Provost made the costly decision to pull the plug. The budget allocated to finish Phase II of the Workday Student implementation was swept. The work completed in Phase I was deleted because PARKER declined paying $5,000.00 annually to store the information until the implementation project could be restarted. PARKER urged FPUBOT to consider abandoning the Workday system altogether, for HCM, Financials, Payroll, and Budget Planning in Adaptive because it was "poorly implemented". A significant percentage of employees satisfied with Workday left FPUBOT at the prospect of undergoing another major system implementation to outdated technology.

## Demotion/Reorganization

101. FPUBOT unjustifiably sought to have Ms. DeBose report to the CIO, a peer and fellow department head on the organizational chart. Ms. DeBose was the only department head that was proposed to be moved under a peer.

102.  When Ms. DeBose questioned the change, AVENT suggested that Ms. DeBose's position was not similar to the other department head positions but was similar to the Chief of Police in having no comparators. However, Ms. DeBose pointed out that finding that potential comparators are not similarly situated because of relatively minor, or irrelevant, distinctions would not prevent a potential discrimination complaint and the fact that a prima facie case could be articulated based on the circumstances.

103.  At a December 6, 2022 meeting with DIECKMANN, Ms. DeBose requested to be compensated for the additional volumetric duties she was performing for FPUBOT without any staff support.  In retaliation and for non-budgetary reasons, Ms. DeBose worked alone.  FPUBOT discriminately left the vacant positions in Ms. DeBose's department unfilled.  DIECKMANN feigned that he wanted to receive job applications and communicate with candidates via LinkedIn.  Ms. DeBose activated the Workday feature in a test environment pursuant to a request from HR. DIECKMANN requested that Ms. DeBose establish a LinkedIn profile so that she could use the feature to hire staff for her vacant positions.  After Ms. DeBose did so, DIECKMANN sent multiple requests to be added as a "friend" to Ms. DeBose's profile, as a potential litigation strategy.  Because of his co-worker harassment as a peer and the adverse actions he took against her as a direct report, Ms. DeBose was

reluctant and distressed about adding him to the social media profile but under immense pressure, added DIECKMANN and Laura Marrone.

104. Months later on June 8, 2023, DIECKMANN requested justification for the request for additional compensation in writing, although previously provided.

105. On July 12, 2023, Ms. DeBose responded to DIECKMANN and provided multiple examples via email of the additional work that she was performing that was previously handled by a staff of four. Ms. DeBose's reasons for a one-time bonus were soundly justified and documented. However, in retaliation, DIECKMANN decided to use the salary savings from the vacant lines in Enterprise Systems for raises in IT and for consultants instead of compensating Ms. DeBose for the additional volume of work she performed. DIECKMANN stated that the circumstances did not warrant a bonus or additional compensation. DIECKMANN unreasonably denied Ms. DeBose's request to explain how he arrived at such a determination. DIECKMANN refused to explain or identify "the circumstances" to which he referred. Ms. DeBose's white counterparts were paid additional compensation and bonuses.

106. On January 10, 2023, in an email to Regina Brown, Employee Relations/HR Specialist, as a follow-up to her voice message, Ms. DeBose informed Regina Brown of FARLEY's and DIECKMANN's racial animosity against her. DeBose also

documented AVENT's and PARKER's racial animosity, which fueled FARLEY and DIECKMANN.

107. A September 19, 2023 email with Sherri Pavlik, Executive Assistant, Office of the General Counsel, documents that Ms. DeBose's public record requests and professionally served subpoenas were not complied with. The responses eventually provided in 2023 were deficient and prevented Ms. DeBose from obtaining evidence that would support her claims of the conspiracy and intent to discriminate, retaliate, and create a hostile retaliatory work environment among FPUBOT, GTLAW, and USFBOT and their adverse, discriminatory actions to force Ms. DeBose from her employment. FPUBOT, GTLAW, and USFBOT concealed the discriminatory intent of the contract concerning Ms. DeBose by refusing to provide all underlying documents and emails through September 8, 2023. The emails FPUBOT produced through the end of 2022 were horribly deficient, and FPUBOT refused to provide the scripts it used that would expose why. USFBOT refused to provide responses to discovery and public records requests. These refusals were strategic to prevent Ms. DeBose from preserving her evidence for trial and providing exact or precise dates of discrimination, retaliation, or adverse employment actions to the FCHR (and EEOC) that were within the 180 days or 300 days of extension. This interference with the EEOC/FCHR and the judicial process has been determined to be another form of retaliation.

108. Ms. DeBose requested to extend her DROP retirement date to 2026, submitting the form timely in July 2023. Her request for an extension was denied, which is tantamount to retaliatory de facto termination. The communication came from HR with DIECKMANN copied, signaling that he ultimately denied Ms. DeBose's request to continue her employment, as legislatively provided. Though requested earlier, the communication was delayed, in retaliation, until August 2023, immediately before Ms. DeBose's termination date.

109. An email was sent to the Legislature about the denial of Drop Extension by Regina Siewert, Hispanic female, and Director of University Budgets at FPUBOT, with a statement that FPUBOT denied her and denied Ms. DeBose (black female) while approving a white male. Ms. DeBose was discriminated against due to her race (black/African American), Gender (female), and age (over 40) and retaliated against because of her protected activity with FCHR and EEOC, in violation of the Florida Civil Rights Act (and Title VII of the Civil Rights Act of 1964), as amended.

Use of State Funds to Discriminate/Retaliate and Whistleblower Retaliation

110. The contract between FPUBOT and GTLAW was for the period from July 1, 2020 to June 30, 2021.

111. In September 2020, the contract was amended concerning a Private Attorney Agreement with MCCREA, PAGE, and CARCAMO in May 2020. These same

attorneys, particularly MCCREA, were USFBOT's contracted legal representatives in Ms. DeBose's state and federal court cases.

112.  In August 2023, Ms. DeBose filed Title VII and FCRA complaints with the EEOC and FCHR respectively.

113.  Through discovery and production of all emails, Ms. DeBose will show that FPUBOT continued to use the discriminatory/retaliatory practices recommended by USFBOT and GTLAW against her. For example, by way of:

a.  Contracting to unlawfully oust Ms. DeBose from her position using state funds (in and after January 2020);

b.  Refusing to investigate the misuse of state funds concerning the nonrenewal of Workday Student and consultant reports from Plante Moran and The Tambellini Group by AVENT and PARKER;

c.  Refusing to investigate the misuse of state funds in FPUBOT-GTLAW-USFBOT retaliation scheme against Ms. DeBose on the basis that Ms. DeBose is no longer a state employee—although she was a state employee during all relevant times from July 1, 2020 through June 30, 2021 to August 31, 2023;

d.  Refusing to investigate the circumstances surrounding the CrossVue contract.

e.      Refusing to investigate Ms. DeBose's grievance and multiple updates to it to show discrimination/retaliation.

f.      Withholding nonexempt public records that FPUBOT has a non-delegable mandatory duty to provide;

g.      Compressing Ms. DeBose's salary and denying increases, salary adjustments, extra compensation, or bonuses while paying them to others.

h.      Retaliating against Ms. DeBose by refusing her request to extend her DROP date, effectively terminating her in retaliation for her protected activities, depriving her of a benefit by the legislature to payout 4% versus 1%, additional healthcare benefits, and additional salary for up to three years.

i.      Retaliating against Ms. DeBose's witness, Regina Siewert, by also denying her request to extend her DROP date because of her association with DeBose and her offer of testimony;

j.      Retaliating against Ms. DeBose by decreasing or criticizing Ms. DeBose's performance rating by using CrossVue's implementer access which exceeded Ms. DeBose's security administrator access in Workday, to sabotage or hijack her work;

k.      Reorganizing Ms. DeBose's department to report to DIECKMANN, a harassing co-worker, instead of the VP of Administration and Finance

(VPAF) and CFO as a demotion on account of her protected status(es) and protected activities;

l.      Stripping Ms. DeBose's department of staff/positions, actual budget, budget planning, space, contracts, and job duties/responsibilities in order to allege that Ms. DeBose is/was not comparable or similarly situated to the other department heads with an AVP title;

m.      Promoting DIECKMANN to a VPIT/CIO position to falsely allege or create a pretext justification that Ms. DeBose's demotion did not result in personal harm;

n.      Increasing the pay of Ms. DeBose's witness, Regina Siewert, Budget Director, to a salary more comparable to Ms. DeBose to infer that Ms. DeBose and Regina Siewert are comparators or similarly situated in title or scope when in fact they were not during all relevant times from the start of Ms. DeBose's employment at FPUBOT to 2023. While their breadth, depth, and scope of work has been different, Regina Siewert, a white Hispanic female, also filed a complaint against FARLEY for discriminatory treatment in pay/compensation, for issuing her a written reprimand for unprofessionalism without cause, for seeking to unlawfully terminate her for following FARLEY'S directive rather than be insubordinate, and for attempting to deny her FMLA.

o.      Denying Ms. DeBose's request to increase the pay of Lisette Brigham in order to retain her.   When Lisette Brigham, a white Hispanic female, resigned to accept another position, offering to pay her a salary that exceeded Ms. DeBose's salary and was higher or more comparable to the salaries of department heads FARLEY and DIECKMANN, all the while depriving Ms. DeBose, who trained Lisette Brigham, of raises and promotion, and was better qualified.

p.      Attempting to replace Ms. DeBose with Alicia Maule while Ms. DeBose was still employed and on the job.  Offering to pay Alicia Maule, a white female, a salary that exceeded or was equivalent to Ms. DeBose's salary as well as raises and promotions, all the while depriving Ms. DeBose, who trained Alicia Maule, was better qualified, and also had Workday Project Management and other certifications.

q.      Showing hostility and animosity against Lisette Brigham, to chill her testimony as a potential witness, upon her departure from FPUBOT because she declined to remain employed with FPUBOT and participate in the retaliatory scheme against Ms. DeBose.

r.      Showing hostility and animosity against James Xin, Asian Male, to chill his testimony as a potential witness, by terminating his contingent worker employment.

s.    Using FPUBOT employees and third party contractors to violate the law and misuse the court system.

Satisfaction of Conditions Precedent

114.  Plaintiff has met all conditions precedent and exhausted all administrative remedies prior to filing suit, including:

a. Filing a Charge of discrimination and retaliation through the Florida Commission on Human Relations ("FCHR") and the EEOC;

b. Receiving a Notice of Right to Sue from the EEOC within the appropriate amount of time for filing this action, **(see Exhibits A)**; and

c. Giving notice of tort action taken against FPUBOT pursuant to the requirements of section 768.28(6)(a), Florida Statutes, **(see Exhibit B)**.

d. Obtaining evidence of the contracts by and between FPUBOT and USFBOT's representatives GTLAW and attaching them to this complaint, **(see Exhibit C)**.

e. Verifying the allegations and counts in this complaint by submission of Affidavit from Regina Siewert **(see Exhibit D)**.

f. Verifying the allegations and counts in this complaint by submission of Affidavit from Lisette Brigham **(see Exhibit E)**.

g. Verifying the allegations and counts in this complaint by submission of Affidavit from Regina Brown **(see Exhibit F)**.

h. Verifying that Plaintiff completed the FRS Notice of Election to Participate in the Deferred Retirement Option Program (DROP) and Resignation of Employment to extend her employment to August 31, 2026, (see **Exhibit G**).

i. Verifying the allegations and counts in this complaint by submission of Affidavit from Melissa Vazquez Diaz (see **Exhibit H**).

g. Verifying the allegations and counts in this complaint by submission of Letter from Mark Mroczjowski (see **Exhibit I**).

## III. FACTUAL ALLEGATIONS

115.    Ms. DeBose is female; her race is Black; and she is over 40 years of age.

116.    DeBose was an employee of FPUBOT who has engaged in a protected activity and had "participation" in an EEOC process or "opposition" to discrimination and retaliation by FPUBOT, resulting from a contract FPUBOT entered with GTLAW on behalf of or to benefit USFBOT, with the intent to discriminate, retaliate, and/or create a hostile retaliatory work environment to drive Ms. DeBose away from her employment.

117.    Materially adverse actions were taken against Ms. DeBose by her employer, FPUBOT, including actions in furtherance of the agreement between FPUBOT and GTLAW during Ms. DeBose's employment.

118.    There is a close or very close causal connection between Ms. DeBose's protected activity and the materially adverse actions by FPUBOT.

119. The scope of FPUBOT's actions extend beyond workplace-related or employment-related retaliatory acts and harm.

120. In August 2022, Ms. DeBose made a public records request of her employer, FPUBOT, regarding USFBOT's and GTLAW's continuing communications about her and its retaliatory interference with her employment. The responsive records to Ms. DeBose's request is allegedly 2,725 records.

121. FPUBOT previously provided responses to two public records requests from Ms. DeBose; none of the responses included 'USF'.

122. FPUBOT refused to provide Ms. DeBose with the 2,725 public records.

123. Through discovery, Plaintiff will show that USFBOT and/or GTLAW employees urged FPUBOT not to comply. FPUBOT's General Counsel has asserted that Ms. DeBose already received *public records with a value of $45,000.* FPUBOT's General Counsel sent Ms. DeBose an itemized invoice for $45,946.01 for the public records. FPUBOT's General Counsel stated it was *all or nothing* and refused to provide any of the records unless Ms. DeBose paid the total charge.

124. The emails will show that FPUBOT took, and contracted with GTLAW to take, unlawful adverse employment actions against Ms. DeBose on account of Ms. DeBose's race-gender, age, and protected activities, including litigation against USFBOT, a serial offender.

125. The emails will show that FPUBOT's President, Provost, and General Counsel (both Delulio and Fugett) agreed to take adverse, discriminatory, retaliatory actions against Ms. DeBose on account of her race-gender, protected activity, and complaints against USFBOT and FPUBOT.

126. As a result of the unlawful, adverse employments actions/omissions occurring under the undisclosed conspiratorial agreement among FPUBOT, GTLAW, and USFBOT, Ms. DeBose filed a complaint against FPUBOT for creating a hostile retaliatory work environment and conspiring with others to force her out of her job. Through discovery, Plaintiff will show that FPUBOT followed the same retaliatory scheme that USFBOT and GTLAW deployed against DeBose.

127. FPUBOT created a hostile, retaliatory work environment, using a software consultant (CrossCountry / CrossVue) as USFBOT did with Ellucian, to frustrate Ms. DeBose's purpose, disrupt her work, and lower her estimation in the eyes of the FPUBOT community.

128. FPUBOT discriminated and retaliated against Ms. DeBose through a reorganization, reassignment, removal of supervisory responsibilities, loss of human, fiscal, and budgetary resources on account of her race-gender, age, protected activities—as did USFBOT.

129.   FPUBOT failed to timely evaluate Ms. DeBose and gave her a lower rating to degrade and marginalize Ms. DeBose as USF did, on account of her race-gender, age, protected activity, and complaints against USFBOT.

130.   FPUBOT suppressed Ms. DeBose's pay and denied her promotion to the title/role of AVP as USFBOT did, on account of her race-gender, age, protected activity, and complaints against USFBOT.  FPUBOT deprived Ms. DeBose of this promotional opportunity by promoting a white male without a search, as USFBOT appointed a white female without a search.

131.   FPUBOT terminated or refused to investigate Ms. DeBose's grievance and blocked her access to other available remedial internal mechanisms just as USFBOT did, on account of Ms. DeBose's race-gender, age, and protected activities. e

132.   FPUBOT conspired to unlawfully terminate Ms. DeBose's employment or force her early retirement to deprive her of continued employment accorded by the Florida Legislature to extend her DROP retirement date, in retaliation for and because of Ms. DeBose's race-gender, age, and protected activities.

133.   There is evidence of causation in the emails of FPUBOT, GTLAW, and USFBOT employees, representatives, et al.  to support Ms. DeBose's prima facie case, and well as evidence to refute FPUBOT's defenses or justifications of nonretaliatory, pretextual explanations.

134. There is prima facie evidence of per se discrimination and/or retaliation by the existence of the contracts and underlying documents that FPUBOT, GTLAW, and USFBOT have failed to disclose or concealed from inspection/copying under Florida's public records laws and discovery.

## IV. CLAIMS

### COUNT I - Gender Discrimination in Violation of Title VII.

Plaintiff incorporates Paragraphs 1-134 above as if fully set forth herein.

135. Ms. DeBose is a female.

136. At all times relevant hereto, Plaintiff performed her duties in a satisfactory, professional, and highly competent manner at FPUBOT.

137. FPUBOT subjected Plaintiff to disparate treatment based on her gender (female) in violation of Title VII and/or FCRA, and because she is both Black and female.

138. Defendant FPUBOT's actions against Plaintiff, including but not limited to unlawful termination. FPUBOT's action constitute a retaliatory adverse employment actions based upon Plaintiff's gender, and because she is both Black and female.

139. As a result of FPUBOT's unlawful actions, Plaintiff has suffered and continues to suffer, past and future monetary losses, including damages in the form of lost wages and other benefits, damages to her career and to her professional and

personal reputations, humiliation, emotional pain and suffering, mental anguish and stress, loss of enjoyment of life, and other non-pecuniary losses, and Plaintiff will likely continue to suffer these losses and impairments in the future.

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter a judgment in favor of Plaintiff and against FPUBOT declaring that FPUBOT unlawfully engaged in gender discrimination against Plaintiff in violation of the TITLE VII;

B. Issue a mandatory injunction: 1) Requiring FPUBOT to effectively plan, develop, undertake, implement, and monitor a plan designed to ensure that FPUBOT employees are not subjected to discrimination; and/or 2) Enjoin FPUBOT from interfering with Plaintiff and any of her rights, privileges or benefits of employment or otherwise treating her differently on account of her gender and/or race; and/or

C. Award Plaintiff all lost pay and benefits; and/or

D. Award Plaintiff compensatory damages; and/or

E. Retain continuing jurisdiction in order to ensure compliance with the terms of the mandatory injunction requested herein; and

F. Grant such additional relief as this Court deems just and proper.

**COUNT II - Race Discrimination in Violation of Title VII.**

Plaintiff incorporates Paragraphs 1-134 above as if fully set forth herein.

140.   Ms. DeBose is Black.

141.   At all times relevant hereto, Plaintiff performed her duties in a satisfactory, professional, and highly competent manner at FPUBOT.

142.   FPUBOT subjected Plaintiff to disparate treatment based on her race (Black) in violation of Title VII and/or FCRA, and because she is both Black and female.

143.   FPUBOT's actions against Plaintiff, including but not limited to the failure to promote her, compensate her, and the adverse actions taken against her to create a hostile retaliatory work environment to drive her away or oust her from her employment, constitute adverse employment actions based upon Plaintiff's race, and because she is both Black and female.

144.   As a result of FPUBOT's unlawful actions, Plaintiff has suffered and continues to suffer, past and future monetary losses, including damages in the form of lost wages and other benefits, damages to her career and to her professional and personal reputations, humiliation, emotional pain and suffering, mental anguish and stress, loss of enjoyment of life, and other non-pecuniary losses, and Plaintiff will likely continue to suffer these losses and impairments in the future.

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter a judgment in favor of Plaintiff and against FPUBOT unlawfully engaged in race discrimination against Plaintiff in violation of the TITLE VII;

B. Issue a mandatory injunction: 1) Requiring FPUBOT to effectively plan, develop, undertake, implement, and monitor a plan designed to ensure that FPUBOT's employees are not subjected to discrimination; and/or 2) Enjoin FPUBOT from interfering with Plaintiff and any of her rights, privileges or benefits of employment or otherwise treating her differently on account of her gender and/or race; and/or

C. Award Plaintiff all lost pay and benefits; and/or

D. Award Plaintiff compensatory damages; and/or

E. Retain continuing jurisdiction in order to ensure compliance with the terms of the mandatory injunction requested herein; and

G. Grant such additional relief as this Court deems just and proper.

**COUNT III – Unlawful Retaliation in Violation of Title VII.**

Plaintiff incorporates Paragraphs 1-134 above as if fully set forth herein.

145. TITLE VII forbids retaliation against an employee because she has opposed an employment practice made unlawful by TITLE VII, or because she engaged in FCHR activity, filed a charge, or participated in any proceeding under TITLE VII.

146. Plaintiff is now a former employee of FPUBOT.

147. Plaintiff engaged in protected activity while employed by FPUBOT and filed a charge or participated in proceedings under TITLE VII.

148. Plaintiff engaged in protected activity as described in the paragraphs above when she complained about gender discrimination and race discrimination, including but not limited to: filing a charge of employment discrimination and retaliation with the FCHR and EEOC and filing internal complaints and taking legal action against FPUBOT.

149. The actions of FPUBOT, as fully set forth above, include but is not limited to unlawful termination of Ms. DeBose's employment by denying her legislated right to extend her retirement date. FPUBOT retaliated against Ms. DeBose because of her race-gender, age, and protected activities, violating TITLE VII. Plaintiff's opposition to the discriminatory / retaliatory treatment she experienced based on race, gender, age, or other covered categories was protected.

150. The foregoing actions are the types that are reasonably likely to deter protected activity by Plaintiff and/or other employees, and therefore constitute retaliation in violation of TITLE VII.

## COUNT IV – Civil Conspiracy

Plaintiff incorporates by reference the preceding allegations 1-134 as if set forth herein at length.

151. A conspiracy existed between FPUBOT, GTLAW, and USFBOT.

152. FPUBOT and GTLAW agreed to do an unlawful act or to do a lawful act by unlawful means, in unlawfully discriminating against, retaliating against, and

creating a hostile retaliatory work environment against Ms. DeBose during the course and scope of her employment with FPUBOT.

153. FPUBOT and its conspirators caused damage to Plaintiff as a result of the acts performed in addition to or pursuant to the agreement.

154. FPUBOT and its conspirators GTLAW and USFBOT, participated in a common design or scheme, and coordinated or acted in concert together to accomplish an unlawful purpose, to discriminate, retaliate, and subject Ms. DeBose to a hostile retaliatory work environment in the course and scope of her employment. FPUBOT unlawfully discriminated and/or retaliated in pay, compensation, and benefits, in violation of TITLE VII and Florida Common Law.

155. FPUBOT and GTLAW agreed by way of a contract to participate in a common design or scheme and coordinated or acted in concert together to accomplish an unlawful purpose, to discriminate and retaliate in Ms. DeBose's employment, pay, compensation, and benefits, in violation of TITLE VII and Florida Common Law.

156. FPUBOT participated in a common design or scheme, and coordinated or acted in concert together with its conspirators to accomplish a lawful purpose by unlawful means, to procure a favorable judgment over Ms. DeBose by its misrepresentations, concealment, and nondisclosure, acting in willful disregard or contempt of court—violating Plaintiff's fundamental, constitutional, and statutory

right to inspect/copy public records under the Florida Public Records Act, Chapter 119; violating the Florida Rules of Civil Procedure discovery rules; and failing to comply with the court(s) subpoena powers and/or court orders.

157.   FPUBOT aided and abetted its conspirators by setting this scheme in motion and committed overt acts in furtherance of the conspiracy between FPUBOT and GTLAW, et al. to discharge or otherwise to discriminate and/or retaliate against Ms. DeBose with respect to compensation, terms, conditions, or privileges of employment, because of her protected classifications based on race, gender, and age.

158.   It was unlawful of FPUBOT to discriminate and/or retaliate against Ms. DeBose in violation of the TITLE VII.

159.   Because of the conspiratorial scheme and its animus against protected classifications, FPUBOT discriminated, retaliated, and created a hostile retaliatory work environment against Ms. DeBose in the course and scope of her employment. Ms. DeBose may be entitled to damages from FPUBOT.

   WHEREFORE, Plaintiff demands judgment against FPUBOT.

### COUNT V - Age Discrimination in Violation of Title VII.

   Plaintiff incorporates Paragraphs 1-134 above as if fully set forth herein.

160.   Ms. DeBose is over 40 years of age.

161.   At all times relevant hereto, Plaintiff performed her duties in a satisfactory, professional, and highly competent manner at FPUBOT.

162.   Defendant FPUBOT subjected Plaintiff to disparate treatment based on her age, in violation of TITLE VII, because Ms. DeBose is over 40.

163.   Ms. DeBose was nearing retirement.

164.   FPUBOT's actions against Plaintiff, included but is not limited to depriving her of pay, promotion, budget, staff, and refusing to compensate her under conditions not imposed on other employees.

165.   As a result of FPUBOT's unlawful actions, Plaintiff has suffered and continues to suffer, past and future monetary losses, including damages in the form of lost wages and other benefits, damages to her career and to her professional and personal reputations, humiliation, emotional pain and suffering, mental anguish and stress, loss of enjoyment of life, and other non-pecuniary losses, and Plaintiff will likely continue to suffer these losses and impairments in the future.

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter a judgment in favor of Plaintiff and against FPUBOT for unlawfully engaging in age discrimination against Plaintiff in violation of TITLE VII;

B. Issue a mandatory injunction: 1) Requiring FPUBOT to effectively plan, develop, undertake, implement, and monitor a plan designed to ensure that FPUBOT employees are not subjected to discrimination; and/or 2) Enjoin FPUBOT from further interfering with Plaintiff and any of her rights,

privileges or benefits of employment or otherwise treating her differently on account of her age; and/or

C. Award Plaintiff all lost pay and benefits; and/or

D. Award Plaintiff compensatory damages; and/or

E. Retain continuing jurisdiction in order to ensure compliance with the terms of the mandatory injunction requested herein; and

F. Grant such additional relief as this Court deems just and proper.


## COUNT VI – Hostile Work Environment Harassment

Plaintiff re-alleges paragraphs 1-134 of this Complaint as if fully set forth under this count.

166.  Ms. DeBose, a black female over the age of 40 years belongs to a protected group or classification.

167. Ms. DeBose was subject to unwelcome harassment at FPUBOT by DIECKMANN and FARLEY, her peers, and also by her managers or University cabinet members AVENT, PARKER, and later DIECKMANN.

168. The harassment was because of Ms. DeBose's race, gender, and age or being a member of a protected classification.

169. The harassment was sufficiently severe or pervasive to alter the terms and conditions of Ms. DeBose's employment and created a discriminatorily abusive working environment.

170. FPUBOT was responsible for such environment and has direct liability for the acts/omissions of its employees, agents, and assigns. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter a judgment in favor of Plaintiff and against FPUBOT declaring that Defendant unlawfully engaged in hostile work environment harassment against Plaintiff in violation of the TITLE VII;

B. Issue a mandatory injunction: 1) Requiring FPUBOT to effectively plan, develop, undertake, implement, and monitor a plan designed to ensure that FPUBOT's employees are not subjected to discrimination; and/or 2) Enjoin FPUBOT from further interfering with Plaintiff and any of her rights, privileges or benefits of employment or otherwise treating her differently on account of her gender and/or race; and/or

C. Award Plaintiff all lost pay and benefits; and/or

D. Award Plaintiff compensatory damages; and/or

E. Retain continuing jurisdiction in order to ensure compliance with the terms of the mandatory injunction requested herein; and

F. Grant such additional relief as this Court deems just and proper.

## COUNT VII – Coworker Hostile Work Environment Harassment

Plaintiff re-alleges paragraphs 1-134 of this Complaint as if fully set forth under this count.

171.   Ms. DeBose, a black female over the age of 40 years belongs to a protected group or classification.

172. Ms. DeBose was subject to unwelcome harassment at FPUBOT by DIECKMANN and FARLEY, her peers or fellow coworkers.

173.   The harassment was because of Ms. DeBose's race-gender and age or being a member of a protected classification.

174.  The harassment was sufficiently severe or pervasive to alter the terms and conditions of Ms. DeBose's employment and created a discriminatorily abusive working environment.

175.  FPUBOT waw responsible for such environment and is directly and/or vicariously liable.

176.  FPUBOT's leadership, AVENT and PARKER, had actual knowledge of FARLEY'S and DIECKMANN's conduct and that it was sufficiently severe and pervasive.

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter a judgment in favor of Plaintiff and against FPUBOT declaring that FPUBOT unlawfully engaged in co-worker hostile work environment harassment against Plaintiff in violation of the TITLE VII;

B. Issue a mandatory injunction: 1) Requiring FPUBOT to effectively plan, develop, undertake, implement, and monitor a plan designed to ensure that FPUBOT's employees are not subjected to discrimination; and/or 2) Enjoin FPUBOT from further interfering with Plaintiff and any of her rights, privileges or benefits of employment or otherwise treating her differently on account of her gender and/or race; and/or

C. Award Plaintiff all lost pay and benefits; and/or

D. Award Plaintiff compensatory damages; and/or

E. Retain continuing jurisdiction in order to ensure compliance with the terms of the mandatory injunction requested herein; and

F. Grant such additional relief as this Court deems just and proper.

## COUNT VIII – Whistleblower Retaliation

Plaintiff re-alleges paragraphs 1-134 of this Complaint as if fully set forth under this count.

177.  Ms. DeBose engaged in protected activity, filing an internal complaint or grievance with FPUBOT Employee Relations/HR and external complaints with the FCHR (and EEOC), etc. against FPUBOT.

178. Adverse employment actions were taken against Ms. DeBose because she engaged in protected activity.

179. Based on the timing or proximity of the adverse employment action to Ms. DeBose's protected activity, there is causal connection between protected activities and adverse personnel action.

180. Ms. DeBose disclosed the contract FPUBOT entered with GTLAW, MCCREA, PAGE, and CARCAMO on behalf of USFBOT to discriminate, retaliate, create a hostile work environment, with the goal to oust Ms. DeBose from her job to the Florida Board of Governors ("FLBOG"), the governing board that serves as the governing body for the State University System of Florida, which includes all public universities in the state of Florida..

181. Ms. DeBose reported the use of staff funds to do something for an unlawful purpose or by unlawful means—i.e., discriminate, retaliate, and create a hostile retaliatory work environment to oust Ms. DeBose from her employment.

182. Ms. DeBose disclosed this rule, policy or statute violation, malfeasance, or misfeasance.

183. The FLBOG assigned Ms. DeBose's complaint to the internal auditor at FPUBOT, whose objectivity, impartiality, and ability to be fair under the circumstances was questionable.

184. FPUBOT's internal auditor immediately declined to investigate the complaint, on the basis that Ms. DeBose was not a state employee at that time. FPUBOT's internal auditor unreasonably concluded that the Whistleblower statute did not apply to shield FPUBOT and his superiors from an investigation.

185. Ms. DeBose was a state employee in 2020 when the agreements were made and put into effect.

186. Ms. DeBose was a state employee when she discovered the existence of the contracts, concerning which she was a subject, and made a request to obtain them.

187. Ms. DeBose was a state employee at the time FPUBOT refused to produce the contracts and/or the underlying documents in response to her public record request and subsequent discovery request by court-issued subpoena(s).

188. Ms. DeBose was a state employee through August 31, 2023 when FPUBOT refused to extend her retirement date.

189. The materially adverse employment actions taken against DeBose pursuant to the contract by and among FPUBOT, GTLAW (MCCREA, PAGE, and CARCAMO), and USFBOT because of Ms. DeBose's protected activities, would discourage a reasonable employee from making or supporting a charge of discrimination.

190. The adverse actions taken by FPUBOT pursuant to and in addition to the contract and because of Ms. DeBose's protected activities, might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

191. Ms. DeBose disclosed FPUBOT's mismanagement, misuse, and waste of state funds Ms. DeBose disclosed this rule, policy or statute violation, malfeasance, or misfeasance, paying for the subscription for the Workday Student System and implementation costs over a two-year period and canceling when phase 1 of development, testing, and implementation was over 90 percent complete. The campus community supported the product and project. Two consultant companies hired by PARKER and AVENT recommended the continuation of the Workday Student System. The publication of the report was delayed because the content was altered and changed to obtain approval or acceptance by FPUBOT. PARKER demanded deletion of the Workday Student implementation tenants to ensure there was no turning back. PARKER stated he would manage the university audit and compliance office and the state auditors that "missed findings staring them right in the face."

192. The decision to leave Workday Student and discussions about leaving the Workday System altogether resulted in high turnover and attrition, dissatisfaction with University leadership, and division between academic affairs and finance, leading to terminations. Employees who contributed to the implementation efforts

and their successes did not want to go through another implementation major implementation with a different vendor and system. The goal was always a single, integrated systems in look, feel, and ease of use. AVENT's and PARKER's decision made it difficult to be competitive in hiring faculty/staff positions and attracting students interested in universities with state of art or the latest technology.

193. In retaliation against Ms. DeBose, FPUBOT refused to investigate or participate in an investigation.

194. In retaliation, PARKER and AVENT solicited negative feedback about the Workday Student System from the campus community using Ms. DeBose. When a survey approved by Institutional Research was conducted by Enterprise Systems, Ms. DeBose's department, as statistically valid showed high usage satisfaction of over 90%, PARKER and AVENT relied instead on anecdotal comments from FARLEY. DIECKMANN, interested in high earnings and power, used PARKER as his bellwether or barometer for selection though he expressed to IT his interest to stay with Workday.

195. PARKER, AVENT, FARLEY, and DIECKMANN retaliated against Ms. DeBose on account of her race-gender, age, and protected activities. They wanted Ms. DeBose to be the source of blame for their poor decision-making.

196. The materially adverse employment actions taken against DeBose would discourage a reasonable employee from making or supporting a charge of discrimination.

197. The adverse actions taken by FPUBOT might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter a judgment in favor of Plaintiff and against FPUBOT declaring that FPUBOT unlawfully engaged in Whistleblower Retaliation against Plaintiff in violation of the TITLE VII;

B. Issue a mandatory injunction: 1) Requiring FPUBOT to effectively plan, develop, undertake, implement, and monitor a plan designed to ensure that FPUBOT employees are not subjected to retaliation; and/or 2) Enjoin FPUBOT from further interfering with Plaintiff and any of her rights, privileges or benefits of employment or otherwise treating her differently on account of her gender and/or race; and/or

C. Award Plaintiff all lost pay and benefits; and/or

D. Award Plaintiff compensatory damages; and/or

E. Retain continuing jurisdiction in order to ensure compliance with the terms of the mandatory injunction requested herein; and

F. Grant such additional relief as this Court deems just and proper.

## COUNT IX – Intentional Infliction of Emotional Distress

Plaintiff re-alleges paragraphs 1-134 of this Complaint as if fully set forth under this count.

198. FPUBOT engaged in intentional or reckless conduct.

199. FPUBOT's conduct was outrageous.

200. FPUBOT's conduct caused Ms. DeBose emotional distress.

201. Ms. DeBose's emotional stress was severe.

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter a judgment in favor of Plaintiff and against FPUBOT.

B. Award Plaintiff a total of $50,000.00 in emotional distress damages.

## COUNT X - BREACH OF CONTRACT

Ms. DeBose alleges and incorporates each of the factual allegations stated in paragraphs 1-201.

202. On August 31, 2024, Plaintiff was performing her job as Department Head or Senior Director of Enterprise Systems under an annual employment contract that was set to legislatively renew for three (3) more years, upon execution of an extension form to extend her DROP date by Ms. DeBose to extend her retirement date.

203. Ms. DeBose completed the form weeks or more in advance of her retirement date and timely submitted it to FPUBOT Human Resources.

204. The form was anticipated by the legislature to result in automatic extension as a matter of right.

205. On or around August 29, 2023, prior to Ms. DeBose's retirement date from her position as Department Head or Senior Director of Enterprise Systems, FPUBOT's Human Resources AVP and DIECKMANN denied Ms. DeBose's form extending her retirement date, effectively terminating her employment for unlawful reasons or by unlawful means.

206. Having no other alternative, Ms. DeBose was forced to submit her DROP termination form or lose retirement income and benefits.

207. FPUBOT's unlawful termination was close in time or temporal proximity to Ms. DeBose's protected activity with FPUBOT's Employee Relations / Human Resources inquiring about the extension and her protected activity with FCHR and the EEOC.

208. Upon information and belief, on and before August 31, 2023, before the end of Ms. DeBose's annual employment contract, and before the end of the automatic legislative extension, FPUBOT took action to terminate Ms. DeBose's employment, violating the active employment contract and in violation of the legislative intent.

209. At all times material hereto, Plaintiff has performed her obligations under the annual employment agreement and legislative retirement date extension.

210. The breaches of contract by FPUBOT resulted in injury to the Plaintiff.

211. As a result, Plaintiff seeks all amounts owed by FPUBOT, had her DROP retirement date been extended as intended by the Florida legislature. Further, the Plaintiff seeks all actual, consequential, and incidental damages that have resulted from FPUBOT's breach plus costs, expenses, and pre- and post- judgment interest as allowed by law.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A.   Enter a judgment in favor of Plaintiff and against FPUBOT declaring that FPUBOT unlawfully breached the contract; and/or

B.   Specific performance of the contract; and/or

C.   Reinstate Plaintiff to employment with Defendant FPUBOT, or, in the alternative, award Plaintiff front pay; and/or

D.   Award Plaintiff all lost pay and benefits pursuant to the contract; and/or

E.   Award Plaintiff compensatory damages; and/or

F.   Award Plaintiff all actual damages; and/or

G.   Award Plaintiff consequential and incidental damages; and/or

H.   Award Plaintiff her costs, expenses, and any applicable attorneys' fees;

J.   Retain continuing jurisdiction in order to ensure compliance with the terms of the mandatory injunction requested herein; and/or

K.   Grant such additional relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court grant relief against FPUBOT as follows:

A. Enter judgment against FPUBOT, in the ways enumerated in this Complaint and by other means; and/or

B. Award Plaintiff monetary damages and other money relief for the FPUBOT's violations, in the ways enumerated resulting from violations of law; and/or

C. Award Plaintiff monetary damages and other money relief for her property interests in her employment as well as her money judgment, damages, interest, costs, fees, and other relief that deprived Plaintiff of her rights, privileges, protections, and compensation under the law;

D. Trial by jury as to all issues so triable; and

E. Grant such other legal and equitable relief as may be just and proper.

## PLAINTIFF'S VERIFICATION

Angela W. DeBose, the Plaintiff, has reviewed the Complaint and knows or believes that all allegations that the Plaintiff has personal knowledge of to be true. The Plaintiff further believes the allegations that the Plaintiff does not have personal knowledge of to be true based on specified information, documents, or both.

/s/ Angela DeBose
Angela DeBose, Plaintiff

## RESERVATION OF RIGHTS

Plaintiff reserves his right to further amend this Complaint to include counts upon completion of her investigation and discovery, to assert any additional claims for relief against FPUBOT or other parties as may be warranted under the circumstances and as allowed by law. The Plaintiff has contacted the EEOC and may bring TITLE VII and/or 1866 claims against FPUBOT in a court of competent jurisdiction.

## PLAINTIFF'S DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted this **3rd** day of April, 2025.

/s/ Angela DeBose
Angela DeBose, Plaintiff
1107 W. Kirby Street
Tampa, FL 33604
813-932-6959
awdebose@aol.com